HENRY W. VAN WAGENEN, administrator of John Whitehead, deceased,

*v.*

ROSE M. L. BONNOT et al.

[Decided November 22d, 1906.]

1. Under *P. L. 1900 p. 363 § 4*, excluding testimony by a party to an action as to a transaction with a decedent, a party seeking to establish a gift *causa mortis* was not competent to testify to the delivery of a package to her by the deceased, but might testify as to what occurred after carrying the package out of the room in which it was claimed delivery was made.

2. The return of a package containing an alleged gift *causa mortis* to the donor was a resumption of possession and, *ipso facto*, a revocation of the gift.

3. Savings bank-books are proper subjects of gifts *causa mortis*.

4. Evidence considered, and *held* to establish a gift *causa mortis*.

Heard on bill, answer, decree of interpleader, statements of claim and proofs. .

*Mr. Edwin G. Adams,* for the complainant.

*Mr. Louis Hood,* for the defendant Bonnot.

*Mr. Alfred F. Stevens* and *Mr. Frederick F. Guild,* for the defendant Guild, substituted administrator of Minnie A. Harrison.

EMERY, V. C.

This is a bill of interpleader filed by the administrator of John Whitehead, deceased, who has, under a decree of interpleader made in this cause, deposited in court four savings bank-books, which were in Mr. Whitehead's possession at the time of his death, and came into the possession of complainant as his

administrator. Three of the books were savings bank-books issued to Minnie A. Harrison and standing in her name in three different savings banks: Franklin Savings Institution, of Newark, for $4,307.15; Seamen's Bank for Savings, New York City, $2,173.50, and Greenwich Savings Bank, New York City, for $2,960.57, a total of $9,441.22.

Minnie A. Harrison died intestate on December 16th, 1902, and on December 23d, 1902, Mr. John Whitehead was appointed her administrator. He subsequently had a new deposit-book issued to himself as administrator, for the deposit in the Franklin Savings Institution, and this book also is deposited in court. The defendant Mrs. Bonnot claims that the three deposit-books issued to Miss Harrison belong to herself, by virtue of a gift or donation *causa mortis* made to her by Miss Harrison two days before her death, and that shortly after Miss Harrison's death, and before Mr. Whitehead's appointment as administrator, she delivered these three books to Mr. Whitehead in his personal capacity as her bailee or attorney. She subsequently brought a suit in replevin for the books against Mr. Whitehead personally, in which suit he set up title to the books in himself as Miss Harrison's administrator. This suit was pending at the time of Mr. Whitehead's death, and the defendant Mr. Frederick F. Guild, having been appointed substituted administrator of Miss Harrison, demanded of complainant, Whitehead's administrator, the possession of the books, whereupon this bill was filed, the suit by Bonnot enjoined, and the defendants, after hearing, directed to interplead.

The three deposit-books issued to Miss Harrison belonged to her, and the question in the case is whether Mrs. Bonnot has satisfactorily proved a gift or donation of them to her *causa mortis*. The alleged gift was made to Mrs. Bonnot personally by Miss Harrison during her last illness, about two days before her death, and in the presence of one of the daughters of Mrs. Bonnot, a young girl then about sixteen years of age. Under our Evidence act (*Rev. 1900, P. L. p. 363 § 4*), excluding testimony by any party to the action as to any transaction with the intestate, this daughter's testimony is the only legal evidence of this transaction between Miss Harrison and Mrs. Bon-

not, and it is the only evidence which has been offered for that
purpose.   On her evidence, the first question fairly raised is
whether it sufficiently proves that the books in question were in
an unopened parcel or package delivered to Miss Harrison by
Mrs. Bonnot as the gift in question.   Her account, taken from
her whole evidence, direct as well as cross-examination, and the
evidence of the other witnesses, so far as it bears on the question
of the contents of the parcel, is substantially as follows:   Mrs.
Bonnot's house on Orange mountain was a short distance from
Miss Harrison's, and the daughter was at the house of Miss
Harrison and in attendance on her from the Friday preceding
Miss Harrison's death on Tuesday, continuously, with the ex-
ception perhaps of a few minutes each day and ten or fifteen
minutes on Sunday, when she went to her mother's home on an
errand.   Mrs. Bonnot herself was at Miss Harrison's continu-
ously from Saturday morning until eleven or twelve o'clock on
Monday morning.   Miss Harrison, who was an invalid suffering
from consumption, had been failing for two or three weeks, and
since this Friday had been confined to her bed.   She had lived
alone from the June previous without any companion or attend-
ant other than Miss Bonnot.   There is some dispute in the evi-
dence as to how much of the time Miss Bonnot was there during
the spring and summer previous to the last illness, but this is
not material for present purposes.   On Saturday morning Mrs.
Bonnot came to the house, got tea for Miss Harrison and gave
it to her in bed.   This bed was in the kitchen, where Miss Harri-
son usually slept, it being the warmest and most convenient room
in the house.   It opened on a porch enclosed by lattice-work and
locked, and a window, under or by the side of which the bed
stood, opened on this porch.   Before the time of the alleged gift
there was a conversation between Miss Harrison and Mrs. Bon-
not about Mrs. Bonnot's affairs, brought on, as the daughter
says, by Miss Harrison noticing that her mother seemed worried.
Mrs. Bonnot said she was worried about the interest on the
mortgage on her house, which she had not been able to pay
because of not getting money due to her, and because the persons
who held the mortgage were pressing for the principal, $1,000
or $1,500.   Miss Harrison then spoke about the trouble she

herself had in collecting the interest on one of her mortgages given by a Mr. Richards, and Mrs. Bonnot requested or suggested to Miss Harrison to transfer this mortgage to her property, as it was just the amount she wanted. Miss Harrison said she would see about it. The Richards mortgage, as appears from the inventory, was a $1,500 mortgage. After Mrs. Bonnot had been there about two hours, Miss Harrison from her couch called to Miss Bonnot, asking if she was there, and, receiving her reply that she was, said, "I want your mother's house to be free; I want her to rest." Miss Harrison then turned to Mrs. Bonnot, told her to reach back of her and get a package from beneath her pillow, or to help her get something from beneath her pillow. Mrs. Bonnot reached back beneath the pillows on the bed and handed a package to Miss Harrison. It was a long package, wrapped up in a very soiled cloth. Miss Harrison took it in her hands, felt of it and passed it into Mrs. Bonnot's hands, and said, "Take this; they are yours; you will find they will be valuable to you." The package was not opened. Neither was anything said at the time as to what was in it, nor could the witness tell, from the shape, form or appearance, what was in it. Mrs. Bonnot took the package, went out on the porch and hung the package on the ear or hinge of the blind of the window opening on the enclosed porch. Miss Bonnot says that it was hung outside on the porch because it was rather filthy and unhealthy. Miss Harrison expectorated a great deal, and it was unhealthy to have it in the room, and Mrs. Bonnot, whose evidence as to what occurred outside of the room is admissible, says that the bundle looked like a bundle of rags, and that she kept it on the back porch with some other rags she had put out while Miss Harrison was sick. She also says she did not know it contained bank-books. After the bundle or package had been hung outside,

"When she came in, Miss Harrison asked mother where she had put them, and mother said, 'I hung them outside near the blinds; they are safe out there.' Miss Harrison looked through the window to see if they were there, and seemed rather anxious about their being out there, and then mother told her they would be all right there."

Miss Harrison, as the witness says, during the afternoon laughed as if she were having a joke to herself. "Now," she

says, "I .want you to rest," after she had given her the package
and mother put it outside. No further conversation took place
about the package until Sunday morning, up to which time it
remained on the porch. On Sunday morning, between nine and
eleven, or between eleven and twelve (the witness gives both
hours), Miss Harrison directed the bundle to be brought to her.
Mrs. Bonnot brought it into the room and handed it to Miss
Harrison, who was still in bed. Miss Harrison handed it back
to Mrs. Bonnot again, and she said, "Take them; they are
yours." Mrs. Bonnot said, "Where shall I put them; what will
I do with them?" Miss Harrison then said, "Take them; put
them in your satchel; they are yours." The parcel was not
unwrapped or opened or the wrappings changed on Sunday.
Neither was anything said by Miss Harrison at the time of this
second delivery about the contents of the parcel. After this
second delivery, however, and during the afternoon, Miss Harri-
son, according to the witness, said "she knew mother could rest
now." And the witness also says that when the package was
delivered on Sunday, Miss Harrison said, "This will do it." No
further reference was made to this parcel by Miss Harrison
during her life. On Sunday morning, previous to this incident,
Miss Harrison had been taken with a severe coughing fit, and, as
Miss Bonnot thought, had coughed up part of her lung, and she
so told Miss Harrison, who then said she knew she was going to
die. Mrs. Bonnot, with her daughter, spent the day and night
with Miss Harrison, and during the day there was considerable
conversation about Miss Harrison's wishes in regard to Mrs.
Bonnot's daughters and their education, and about one or two
other persons whom she wished to be remembered. On Monday
morning Mrs. Bonnot and her daughter rose about seven o'clock,
and after giving Miss Harrison her breakfast and making her
comfortable, a long conversation occurred about Miss Harrison's
wishes in relation to the disposition of her property, and at her
direction Mrs. Bonnot wrote down on a slip of paper her wish
in regard to it, which was read over to Miss Harrison and read
by her and then signed. This paper was to be taken to Mr.
Whitehead, and immediately after it was drawn Mrs. Bonnot
left Miss Harrison and came to Newark and delivered the paper

at Mr. Whitehead's office on Monday afternoon.    Arrangements
were then made by her that a will was to be drawn, and Mrs.
Bonnot was, as she thinks, to meet, at Miss Harrison's on Tues-
day afternoon, someone from Mr. · Whitehead's office with the
will.    This original paper, signed by Miss Harrison, has been
lost, but a copy was preserved among Mr. Whitehead's papers,
and is as follows:

"DECEMBER 15th, 1902.
"ST. CLOUD, WEST ORANGE.
"This is my last wish.    I wish that Madame Bonnot's house be cleared
of debt and anything else she wants, books, furniture.    She is to pay my
lawful debts and whatever she disposes of is all right.    Don't wish my
relatives, Mr. Flavel, nor, above all, Miss Davy, to meddle in my affairs.
I wish Mr. John Whitehead to do it for Madam Bonnot.
"M. A. HARRISON."


A will was drawn by Mr. Whitehead, dated December 17th,
1902, but was not executed, as Mr. Payne, the partner of Mr.
Whitehead, did not reach Miss Harrison's until after her death,
and perhaps not until the afternoon of Wednesday, the day the
will was dated.

Mrs. Bonnot did not return to Miss Harrison's until Tuesday
afternoon, about four or five o'clock, just after Miss Harrison's
death.    As she came near the house she met her daughter, who
had stayed there alone from the time of her mother's departure
on Monday until the end, and was then going away ill.    Mrs.
Bonnot went into the house and was there alone, or with another
daughter, until the body was removed the next day to an under-
taker's.    She also remained on at the house from that time until
about January 7th.    On Thursday, the day of the funeral, she
was at the home in Newark of another daughter, and the daugh-
ter Ernestine was also at the house.    She says that she was in
another room, and hearing an exclamation from her mother,
went into the room where the latter was.    Her mother then
showed her the three bank-books.    She said she had just opened
the package, and it was on her knees.    There was the dirty cloth
around it, and there was something else wrapped around it—a
paper or piece of chamois, or maybe another small cloth.    It
was evident that the daughter did not at this time see the parcel
or package in the original condition in which it was delivered.

The exclamation of her mother followed and evidently did not precede the opening of the parcel. The evidence of this witness, therefore, fails to show that the parcel up to this time retained its original form or appearance at the time of the delivery to Mrs. Bonnot. The direct proof that these books were in this parcel at the time of the delivery of the parcel to Mrs. Bonnot by Miss Harrison on Sunday depends entirely, therefore, on the evidence of Mrs. Bonnot herself. The title must be derived from the delivery on Sunday, for the return of the package to Miss Harrison by her direction on Sunday morning was a resumption of possession by her, and, *ipso facto,* a revocation of the gift of the previous day, so far as delivery under it was concerned. The conversation on Saturday may, however, be important as bearing on the delivery on Sunday. Miss Bonnot's account of the transaction on Sunday ends with the deposit of the bundle in her mother's satchel in Miss Harrison's presence, and from the time of this deposit she does not speak of seeing the bundle or the satchel again before her mother left the house on Monday morning. Mrs. Bonnot says that the bundle stayed in that satchel in Miss Harrison's room until the next morning (Monday). She further says that on Monday morning she brought the bundle to Newark and put the bundle in a room at the house where another of her daughters was living. Whether the bundle was brought to Newark in the satchel is not directly stated, but from the fact that Mrs. Bonnot also says that on the day she opened the bundle (Thursday) she had it in her satchel, and took it from where she had it and opened it, it may fairly be taken as proved by her that on Monday she brought the satchel, with the bundle, to Newark. On opening the bundle on Thursday she does not speak of anyone being present, or of her daughter Ernestine seeing it opened. She says that up to that time there was no change made in the appearance of the bundle from the time she first put it on the back porch on Saturday. She opened the bundle and saw the three books in question, and says that up to that time she did not know what was in the bundle, and had not seen the books. A piece of white paper without writing on it, so far as she noticed, was wrapped up with the books. She threw the soiled rag away, wrapped the bank-

books in wrapping paper and took them to Mr. Whitehead's office the same day, and there delivered them to Mr. Fleischel, a clerk in the office, or to Mr. Payne, Mr. Whitehead himself being absent or engaged. She subsequently, and about January 11th, 1903, made a formal demand in writing upon Mr. Whitehead for the return of the books, which was refused. The circumstances relating to the draft of the will do not bear directly on the question of the contents of the parcel, but as the only direct proof of the contents is the evidence of Mrs. Bonnot, these circumstances have a bearing as showing her conduct relating to the deceased or her property after the alleged gift. In *Cosnahan* v. *Grice, 15 Moo. P. C. C. 215; 2 Ch. Eq. Dig. 2012*, it was said that in this class of cases the whole conduct of the parties at the time must be minutely examined, for, on a question of doubtful right, it is impossible not to take into account the conduct of a party at the time when the right becomes first capable of assertion and not to allow its due influence in raising a presumption in favor of or against the claim. The conduct of the donee in taking other property of the deceased after her death was given weight in this case in determining adversely the question of a donation *causa mortis.* In the present case I had a strong impression at the hearing that Miss Bonnot's evidence was not a fabrication, but was truthful and entitled to credit, and I still retain this conviction after a reading and further consideration of her evidence. But considering her testimony as furnishing the clear and satisfactory evidence required in these cases of the delivery of the package to Mrs. Bonnot and the gift to her of its contents, the question remains, What was in this unopened parcel? And as to this the case depends on the credit to be given to Mrs. Bonnot. The parcel was in her possession, unseen by any other person, apparently from Monday morning until Thursday. She was alone in Miss Harrison's house, or with another of her daughters, who has not been called as a witness, from Tuesday afternoon or evening until Thursday, and if it had been proved that during this interval there were in Miss Harrison's house any other securities which could have been added to or substituted for the contents of the bundle, I am inclined to think that under such circumstances a court

would scarcely be safe in relying on the evidence of the donee alone for identification of the contents. Miss Harrison had, as appears from the inventory of her estate, other securities—two bonds and mortgages, one of $10,000, one of $1,500, and five bonds, three of the United Electric Company, par value, $2,000 ; two of a street railway company, par value, $2,000, and apparently had no other securities except the savings bank-books. The $1,500 mortgage was in course of foreclosure, and probably in the custody of Mr. Whitehead, her counsel. The location of the other mortgage and the bonds at the time of her death has not been shown, and a substitution by Mrs. Bonnot of the savings bank-book for these, or any one of them, if she would be guilty of this, could not therefore be assumed, especially so, as securities of this character are usually or often left with attorneys or agents, while savings bank-books, being usually available only to the person, are oftener kept in personal control, and if so kept by Miss Harrison, the probability is that all these books would be kept together in one parcel, rather than separately, and the evidence in the case as to Miss Harrison's business habits and character make it very probable that these bank-books at least were kept about her person as described.

On the case as submitted, therefore, the probabilities as to the contents of this parcel tend to support Mrs. Bonnot's statement and to negative the conclusion or assumption that during the interval between Monday and Thursday she tampered with the parcel either by adding or exchanging securities. The case is one where these probabilities must be given due weight, and her entire evidence must also be considered. In reference to one important matter bearing on her conduct, she has not been, as it seems to me, candid or unequivocal. This relates to the draft of the will. In the conversation on Sunday and Monday relating to what Miss Harrison wished to be done, and the persons she wished to be remembered, persons were named and her wishes as to these stated, but the names of these persons were not on the written memorandum signed by Miss Harrison. Mrs. Bonnot, on reaching Newark with this paper, was in great haste to get to Mr. Whitehead's office, as she proves by a Mrs. Wait, to whom she showed the paper before going. She went to Mr.

Whitehead's office, according to her account, but once with the paper, which she left there. She now says that she don't recall seeing Mr. Whitehead at his office that day; that she won't say she didn't see him, but that she don't recollect, and that she don't recollect leaving any message with the paper, except that it was something to be given to Mr. Whitehead, and that Miss Harrison wanted her to leave this, and to "tell Mr. Whitehead to attend to this for you for me." Apparently, from this account, no person in Whitehead's office had received from Mrs. Bonnot any statement as to the contents of the will to be drawn, except the written memorandum. Nor in all probability had Mr. Whitehead himself, for it appears that Miss Harrison, who seldom came down from the mountain, had not been to Newark for three weeks, and does not seem then to have seen Mr. Whitehead. Mrs. Bonnot herself, as she says, often took the business messages from Miss Harrison to Mr. Whitehead. The will, drawn in Mr. Whitehead's hand, on being produced, includes all the persons who were spoken of in the conversation of Sunday and Monday, the persons to be remembered being Mrs. Bonnot's three daughters, Mr. Whitehead and a young man named Lucian Little, none of whom are mentioned in the memorandum. The will includes, besides, a legacy of $400 to a church, which was not spoken of by Miss Harrison at all. The will, after payment of the debts, directs the payment of $1,500 to Mrs. Bonnot (the amount of the mortgage on her house, referred to in the memorandum), and after giving specific legacies of jewelry to Mrs. Bonnot's daughters, a legacy of $1,000 to Mr. Whitehead (the amount spoken of on Sunday and Monday), $50 to Little and $400 to the church, she directs the appropriation of a sum sufficient to educate the two daughters (Eulalie and Ernestine), and then gives the entire residue of the estate to Mrs. Bonnot. A careful consideration of the conversation on Sunday and Monday, proved by Ernestine; of the memorandum and the circumstances of its writing, and of the document prepared solely for the purpose of carrying out Miss Harrison's wish, justifies the conclusion, I think, that the written memorandum was drawn to show what was to be given to Mrs. Bonnot *herself,* and further, that this memorandum was to authorize Mr. Whitehead to

receive from Mrs. Bonnot the directions as to the disposal of Miss Harrison's properties.

From some source, apparently, Mr. Whitehead did receive directions as to all of the persons who were to be remembered. These directions of Miss Harrison were made in the presence of only Mrs. and Miss Bonnot, and Miss Bonnot was not out of the house until after the death. In view of this coincidence, it is difficult, if not impossible, to resist the conclusion that in some way the provisions in the will, which included the directions of Sunday and Monday, were communicated by Mrs. Bonnot to Mr. Whitehead, and still more difficult to conceive that a devise of the entire residue of the estate would or could have been drawn without a direction from Mrs. Bonnot herself, after the memorandum was delivered. Her present statement that she will not say she didn't see Mr. Whitehead, but only that she cannot at present recall it, is not, in my judgment, reliable. She could not have forgotten seeing Mr. Whitehead about drawing a will from this paper. After her departure from the house immediately on its receipt, her haste to reach Mr. Whitehead's office with it, and her appointment for the next afternoon at Miss Harrison's to meet a person with the will, and with this will drawn as it is, it is not credible that in some way not disclosed by her she communicated with Mr. Whitehead about the will to be drawn from this paper. The doubts thrown on her credibility by her testimony upon this subject, bearing as it does on her conduct in relation to the acquisition by herself, or for her family, of the bulk of Miss Harrison's property by will during the time she held the stocks in question, would seriously affect the weight to be given to her evidence as establishing the contents of the bundle if it were shown that after Miss Harrison's death, and while she had the run of her house, there were other securities in the house. But this has not been shown, and as the delivery of the bundle, containing apparently valuable securities, has been satisfactorily proved by the evidence of another witness, and the surrounding circumstances indicate that it was not improbable that all of the savings bank-books were in the bundle, I do not feel justified in rejecting her statement that the books were in the bundle merely on the ground that if they were not

in the bundle she had the opportunity to put them in after Miss Harrison's death, and that her equivocation about procuring a will to be drafted in her favor would justify me in concluding that she would tamper with the bundle and then swear falsely about it. The equivocation may be attributed to an endeavor not to disclose all that took place in reference to the draft of the will, rather than a character which would resort to crime in order to get possession of the books. Counsel for the administrator urges strongly that the memorandum itself, referring as it does expressly to the freeing of Mrs. Bonnot's property from debt, negatives the idea that a gift had been previously made of the books for this object, but I cannot draw this conclusion, or hold it to be sufficient to outweigh the evidence of gift. The memorandum is evidently not a full or complete disposition of her property by Miss Harrison herself, and required a full explanation, which was to be given to Mr. Whitehead, as the proof shows, by Mrs. Bonnot herself. It may have been intended to confirm the gift by will. The point was suggested, rather than insisted on, by counsel that these savings bank-books on their face required an assignment in writing by the depositor in order to transfer the money to another. This assignment relates to an absolute present assignment as between the bank and the depositor, and is only intended to regulate the legal rights of the bank with the depositor. It would operate, in the present case, no farther than to require the use of the name of the administrator for the recovery of the deposit in a legal action. That savings bank-books are proper subjects of donations *causa mortis* by delivery is settled by the weight of authority in the American courts, and the decisions in our own courts in relation to choses in action are based on reasons which include such books. *Corle v. Monkhouse, 50 N. J. Eq. (5 Dick.) 537, 543, &c. (Vice-Chancellor Van Fleet, 1892)*; *Travelers' Insurance Co. v. Grant, 54 N. J. Eq. (9 Dick.) 208, 212, 213 (Vice-Chancellor Pitney, 1896)*; *Ridden v. Thrall, 125 N. Y. 572, 577 (1891)*.

I will advise a decree declaring that Mrs. Bonnot is entitled to the books in question.